

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **TCN INVESTMENTS, LLC,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **SUPERIOR DETAIL, LONNIE VAUGHT** | ) | **WD82342** |
| **and JULIE VAUGHT,** | ) | |
| | ) | **OPINION FILED:** |
| **Appellants,** | ) | **December 10, 2019** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **TODD C. NEIMEYER,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
**The Honorable Joshua C. Devine, Judge**

**Before Special Division:** Mark D. Pfeiffer, Presiding Judge, and
Edward R. Ardini, Jr., and Thomas N. Chapman, Judges

Superior Detail, LLC ("Superior Detail"), the lessee under a lease agreement with TCN

Investments, LLC ("TCN"), and Mr. Lonnie and Ms. Julie Vaught ("the Vaughts"), personal

guarantors of Superior Detail's obligations under the lease agreement (jointly "Superior"), appeal

the judgment of the Circuit Court of Boone County, Missouri, ruling in favor of TCN on its

breach of lease and guaranty claims against Superior Detail and the Vaughts respectively. We affirm.

## Background[1]

TCN entered into a commercial lease and guaranty agreement ("the Superior Lease") with Superior Detail and the Vaughts on August 23, 2014, for the rental of a portion of TCN's commercial building and surrounding premises located in Columbia, Missouri ("the leased premises"). The Superior Lease was a term lease for an express lease term described in paragraph 2 of the Superior Lease as "beginning on August 1, 2014, and ending on July 31, 2017." The Superior Lease provided for escalating rent amounts triggered on each one-year anniversary through the term of the lease.

Provisions of the Superior Lease relevant to Superior's appeal are as follows:

Paragraph 12 of the lease governed the alteration and improvement of the leased premises by Superior Detail, and provided, in relevant part:

> *Tenant shall not make any alterations* or improvements to the Premises *without Landlord's prior written consent*, which consent shall not be unreasonably withheld so long as any such proposed alterations or improvements do not affect the structural integrity of the building and provided that any such alterations or improvements shall, at Landlord's option, at the end of the Lease term, become Landlord's property or, alternatively, *be removed by Tenant prior to the end of the Lease term at Tenant's sole cost and expense*. Should any such alterations or improvements be removed by Tenant, Tenant shall repair all damage to the Premises occasioned by such removal.

(Emphasis added.)

Paragraph 16 of the lease governed default, and provided, in relevant part:

> It is agreed that (i) if Tenant fails to pay the rent or any part thereof or any other sum due Landlord hereunder when due and such failure continues for five (5) days after written notice thereof from Landlord; or (ii) if Tenant fails to perform in accordance with any other covenant, condition, term, or provision of this Lease

---

[1] "We view the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *May v. Williams*, 531 S.W.3d 576, 582 (Mo. App. W.D. 2017).

to be kept and performed by Tenant and such failure continues for thirty (30) days after written notice thereof is given by Landlord to Tenant; . . . then and in any of such events, Tenant shall be in default hereunder . . . . Should Tenant be in default hereunder, Landlord may:  (a) terminate this Lease; or (b) it may from time to time without terminating this Lease, *make such alterations and repairs as may be necessary in order to relet the Demised Premises and relet said Demised Premises or any part thereof for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental or rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable.*  Upon such reletting without termination, *all rentals received by Landlord from such reletting shall be applied, first to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any costs and expenses of such reletting, including brokerage fees and attorneys' fees and costs of such alterations and repairs; third, to the payment of rent due and payable hereunder and the residue, if any, shall be held by Landlord and applied to the payment of future rents as the same may become due and payable hereunder.*[2]

(Emphasis added.)  In August 2014, Superior Detail opened its car detailing business at the leased premises.

In 2015, Superior Detail removed landscaping from the leased premises and replaced the landscaping with a concrete pad measuring approximately forty feet by sixty feet in front of the building so that Superior Detail could park cars in that space.  Superior Detail did *not* obtain prior written consent from TCN for this project and, in fact, TCN *never* consented to this project.

In December 2015, Superior Detail stopped paying rent, with nineteen months remaining on the term of the Superior Lease.  In February 2016, Superior Detail vacated the leased premises.

Without terminating the Superior Lease, TCN relet the leased premises by entering into a new lease with Unifirst Corporation for a term from May 1, 2016, through April 30, 2019, with an option to extend the lease for an additional three years ("the Unifirst Lease").  Unifirst entered

_____

[2] Thus, the design of paragraph 16(b) merely gives TCN the right:  (1) to re-enter the leased premises upon default to make alterations and repairs so that the leased premises can be relet to another tenant; and (2) to utilize the offset formula to ensure that Superior Detail will not receive the benefit of having its rental obligations under the Superior Lease reduced until such time as rents received from the relet tenant have first been applied to alterations, repairs, and any other non-rent obligations under the Superior Lease.

3

the Unifirst Lease on the condition that TCN alter the height of the loading dock area and truck area adjacent to the loading dock area of the leased premises to accommodate Unifirst's business needs of loading and unloading large trucks for its uniform cleaning business. TCN incurred the expense of engineering fees of $1,187.50 to design the required alteration and paid an excavating and concrete business $19,950 to implement the necessary alteration by excavating near the existing door and pouring additional concrete to allow Unifirst's trucks to access the loading dock. Thus, the total cost related to altering the loading dock height and surrounding loading area on the leased premises was $21,137.50. TCN received $41,250.00 in rent from Unifirst from May 1, 2016, through July 31, 2017, the date upon which the lease term expired on the Superior Lease.

TCN eventually filed a first amended petition for breach of the Superior Lease (including the lease guaranty terms) on August 18, 2017, which sought unpaid rent and other lease-related damages from Superior Detail as the lessee and the Vaughts as the guarantors. Superior filed their answer and asserted both a counterclaim and a cross-claim.

The case proceeded to a bench trial before the trial court and, after hearing the evidence and arguments of the parties, the trial court issued its judgment in favor of TCN and against Superior Detail and the Vaughts, jointly and severally, on all claims, counterclaims, and cross-claims.

After offsetting the total damages under the Superior Lease by the rent received by TCN from the Unifirst Lease ($41,250) up to the expiration of the term of the Superior Lease on July 31, 2017, the trial court awarded remaining unpaid damages to TCN in the amount of $44,400.12.[3] After awarding attorney's fees of $27,637.00 to TCN as the prevailing party (and

---

[3] Though Superior Detail challenges the trial court's award of $21,137.50 for authorized "alterations" and the award of $9,800.00 for landscaping "repair/restoration" damages under the Superior Lease, Superior Detail does

4

as authorized by the terms of the Superior Lease),[4] the trial court entered total judgment in favor of TCN in the amount of $72,037.12. As relevant to this appeal, the trial court awarded damages related to altering the loading dock area of the leased premises in the amount of $21,137.50 and damages related to the cost of restoring the landscaping that had been altered by Superior Detail without the consent of TCN in the amount of $9,800.

This appeal timely follows.

## Standard of Review

Because this case was bench-tried to the court below, the trial court's judgment will be affirmed unless it is not supported by substantial evidence, against the weight of the evidence, or erroneously declares or applies the law. *R & J Rhodes, LLC v. Finney*, 231 S.W.3d 183, 187 (Mo. App. W.D. 2007); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The interpretation of a contract, including a lease agreement, is a question of law, which we review *de novo*. *R & J Rhodes, LLC*, 231 S.W.3d at 187.

## Analysis

On appeal, Superior does not dispute the validity of the Superior Lease or contend that it is ambiguous in any respect. Superior Detail does not dispute that it breached the lease, and the Vaughts do not dispute that they have guarantor liability for any sums due as a result of Superior Detail's breach of the Superior Lease.

In four points on appeal, Superior complains that (I) the trial court erroneously applied the law by misinterpreting the Superior Lease when it only offset the damages Superior owed

---

not challenge the trial court's award of the remaining $54,712.62 in its calculation of damages under the Superior Lease (damages related to, for example, past-due rent, late charges, unpaid utilities, etc.). Thus, after the relet offset credit, there is no dispute that Superior Detail actually received, at minimum, over $10,000.00 in rental obligation offsets that it may not have otherwise received if TCN had elected the remedy it possessed under paragraph 16(a) of the Superior Lease.

[4] There is no argument on appeal by Superior Detail that TCN is *not* entitled (pursuant to the terms of the Superior Lease) to an award of attorney's fees.

under the Superior Lease by the amount of rent paid by Unifirst up to the end of the express term of the Superior Lease, rather than all rent paid by Unifirst including beyond the express term of the Superior Lease; (II) the trial court erroneously applied the law by awarding the $21,137.50 TCN spent to alter the leased premises to induce Unifirst to enter into the Unifirst Lease as a cost of reletting; and (III & IV) the trial court's award of $9,800 for removing the concrete pad and replacing it with the landscaping that existed on the leased premises prior to Superior Detail's unauthorized removal of the landscaping during the time it maintained possession of the leased premises because such award of damages was against the weight of the evidence and constituted an abuse of discretion.

## I. Damages Offset

"The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003) (citation omitted). It is elementary that "[t]he designation of a lease term is an essential element of a lease. The lease term is required to be for a definite and agreed-upon period, and it is essential to the validity of the lease that it prescribes with reasonable certainty the date of commencement and the duration of the term of the lease." 52 C.J.S. *Landlord & Tenant* § 358 (2019) (footnotes omitted).

Here, there is nothing unclear or indefinite in the parties' description of the dates of the Superior Lease's commencement (August 1, 2014) and duration (July 31, 2017). The parties very clearly fixed the beginning date and ending date upon which the obligations of the respective parties were to begin and conclude. These fixed dates governed both the dates upon which Superior's liability for damages relating to monthly rental payments would arise *and* the dates upon which TCN would be responsible for providing any lease reletting offset amounts to

6

Superior as a credit towards the damages owed by Superior under its breach of the Superior Lease relating to monthly rent. To hold otherwise would render the express lease term provisions of the Superior Lease meaningless and such contract "interpretations that render provisions meaningless should be avoided." *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 44 (Mo. banc 2017) (internal quotation marks omitted).

The lease reletting credit offset provision in the Superior Lease states:

> Upon . . . reletting without termination, all rentals received by Landlord from such reletting shall be applied, first to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any costs and expenses of such reletting, including brokerage fees and attorneys' fees and costs of such alterations and repairs; third, to the payment of rent due and payable hereunder[.]

Superior complains the trial court should have offset the damages awarded to TCN by the amount of rent paid by Unifirst through the entirety of *Unifirst's* lease, including any options to extend it may exercise, rather than only through the express term of *Superior's* lease term (*i.e.,* July 31, 2017). Superior's argument requires an interpretation of the lease that renders an absurd result, in contravention of the basic rules of contract interpretation, and that this Court will not adopt. *Sonoma Mgmt. Co. v. Boessen*, 70 S.W.3d 475, 481 (Mo. App. W.D. 2002). Superior argues that, because the offset language says "all rentals received" from reletting, rather than specifying *only* rentals received through the express term of Superior's lease, TCN's reletting offset credit obligation is meant to continue through the entirety of *both* the Superior Lease term *and* the Unifirst Lease term, including any lease extension options exercised under the Unifirst Lease.

To do as Superior argues would cause us to ignore the express term provisions of the Superior Lease or, at minimum, render them meaningless. For example, the very concept of "reletting" is that TCN has found a new tenant to "stand in" for the previous tenant; but, once the

7

previous tenant's lease term has expired, there is no time frame left for the new tenant to "stand in" for. To "offset" monthly rent under Superior's "in perpetuity" argument is to ignore the fixed term of the Superior Lease and seeks a result without function or sense. *See Salsman v. Leonard*, 568 S.W.3d 434, 442 (Mo. App. W.D. 2019) ("A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense.").

It is clear that under the express and clearly stated term lease provisions of the Superior Lease, the parties intended that rents from reletting be used to offset any damages owed by Superior pursuant to *its* term lease only through the term of *that* lease. The trial court's interpretation was not an erroneous application of the law.

Point I is denied.

## II. Alteration

The Superior Lease provided that TCN would apply the rents received from reletting the property without terminating the Superior Lease "second, to the payment of any costs and expenses of such reletting, including brokerage fees and attorneys' fees and costs of . . . alterations and repairs[.]" Alteration is not defined in the lease, and thus we give this unambiguous term its plain and ordinary meaning—often referring to a dictionary and carefully considering the context of the contract to select the appropriate definition. *Bailey v. Federated Mut. Ins. Co.*, 152 S.W.3d 355, 357 (Mo. App. W.D. 2004). The following definition is useful:

> **alteration** (1803) 1. *Property.* A substantial change to real estate, esp. to a structure, usu. not involving an addition to or removal of the exterior dimensions of a building's structural parts. • Although any addition to or improvement of real estate is by its very nature an alteration, real-estate lawyers habitually use *alteration* in reference to a lesser change. Still, to constitute an alteration, the change must be substantial — not simply a trifling modification.
> - **structural alteration.** (1905) A significant change to a building or other structure, essentially creating a different building or structure.

8

*Alteration*, BLACK'S LAW DICTIONARY 97 (11th ed. 2019).

Here, the alteration in question constituted a "substantial change" to the leased premises that resulted in an expense, but was done for the purpose of inducing Unifirst to relet the leased premises and enter into the Unifirst Lease. And, by inducing Unifirst to relet the leased premises, Superior received the benefit of the Unifirst Lease reletting payment credit to offset the damages owed by Superior.

The trial court did not erroneously apply the law by deducting from the Superior Lease reletting credit the $21,137.50 TCN was required to spend to alter the premises to induce Unifirst to enter into the Unifirst Lease as a cost of reletting, as such deduction in the reletting credit was expressly provided for in paragraph 16 of the Superior Lease.

Point II is denied.

## III. Concrete Pad Removal and Landscaping Restoration Expenses

Superior does not contest that paragraph 12 of the Superior Lease required Superior Detail to obtain prior written consent when making alterations to the leased premises, that it did not do so when tearing out landscaping from the leased premises and replacing it with a concrete pad, that paragraph 12 of the Superior Lease dictated that Superior Detail is financially responsible for the cost of any repairs necessary to restore the landscaping to its original condition prior to its removal, and that paragraph 16 of the Superior Lease dictated that any reletting rentals received from reletting via the Unifirst Lease be applied "first to the payment of any indebtedness other than rent due hereunder from [Superior] to [TCN.]"

Superior's argument below and on appeal is that there is no credible evidence that TCN ever intends to make the landscaping repair in question. And, while the trial court heard conflicting evidence regarding the landscaping repair project, the most *relevant* evidence

9

regarding the concrete pad, its intended removal, and replacement with landscaping similar to the original landscaping was Todd Neimeyer's (owner of TCN) testimony on behalf of TCN that he planned for the concrete pad to be removed (at a cost of $4,800.00) and the original landscaping to be reinstalled (at a cost of $5,000.00), which the trial court found credible. We defer to the trial court's credibility determinations. *May v. Williams*, 531 S.W.3d 576, 582 (Mo. App. W.D. 2017).

Superior's argument that this finding by the trial court is against the weight of the evidence and constitutes an abuse of discretion ignores our deference to the credibility findings of the trial court, even in the face of conflicting evidence or inconsistent testimony. *Ivie v. Smith*, 439 S.W.3d 189, 206 (Mo. banc 2014). "A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment"; and "[w]hen the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." *Id.* Further, Superior's argument that the trial court "abused its discretion" in making this credibility determination is, in essence, another argument that this Court should reweigh and accept the evidence that would support the opposite conclusion than that reached by the trial court, in violation of our standard of review, which we will not do. *Lunceford v. Houghtlin*, 326 S.W.3d 53, 64 (Mo. App. W.D. 2010).

Pursuant to paragraphs 12 (Superior Detail's financial responsibility to remove alterations to the leased premises at Superior Detail's sole cost and expense—which Superior Detail had failed to do as of the time of trial) and 16 (any reletting rental offset shall be applied first to the payment of any indebtedness [*i.e.,* the cost of removing the concrete pad and restoring the original landscaping] other than rent due by Superior Detail) of the Superior lease and given the

10

trial court's determination that Todd Neimeyer's testimony was credible, the amount anticipated for removal of the unauthorized concrete pad and replacement of the original landscaping was correctly deducted from the reletting offset as part of Superior's lease indebtedness. Hence, the trial court's judgment deducting $9,800 for the landscaping restoration repair from the reletting offset was not against the weight of the evidence and did not constitute an abuse of discretion.

Points III and IV are denied.

## IV. Attorney's Fees

In the trial court's judgment, it awarded TCN its attorney's fees of $27,637. On appeal, Superior does not challenge the trial court's authority pursuant to the terms of the Superior Lease to award reasonable attorney's fees to TCN.[5] On appeal, TCN has filed a motion seeking additional attorney's fees incurred in defending the present appeal. We conclude that the same provision of the Superior Lease relied upon by the trial court in awarding attorney's fees below authorizes the award of attorney's fees on appeal. *See*, *Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo. App. W.D. 2002) (explaining that "both trial and appellate courts may award attorney's fees to a party if such an award is authorized by . . . contractual agreement."); *Developers Sur. & Indem. Co. v. Woods of Somerset, LLC*, 455 S.W.3d 487, 494 (Mo. App. W.D. 2015) (holding that a party may be allowed to recover attorney fees on appeal "if they are based upon a written agreement that is the subject of the issues that are presented in the appeal.").

TCN's motion for attorney's fees on appeal is well taken and was filed timely in accordance with the Court's local rules. Thus, the motion should be, and is, sustained. However, we remand the case to the trial court for the award of the appropriate amount of

---

[5] The Superior Lease provides in paragraph 16 regarding default that "Landlord may recover from Tenant all reasonable damages directly incurred by reason of any breach or default by Tenant, including, but not limited to, the costs of recovering the Demised Premises, and reasonable attorneys' fees."

reasonable attorney's fees for work on behalf of TCN related to this appeal, because while "appellate courts have authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 58 (Mo. App. W.D. 2016).

## Conclusion

The judgment of the trial court is affirmed. We also grant TCN's motion for attorney's fees on appeal, which was taken with the case, and remand the case to the trial court for the sole purpose of determining and awarding to TCN the appropriate amount of reasonable attorney's fees for work related to this appeal, to be added to the total judgment owed by Superior.

/s/ *Mark D. Pfeiffer*

Mark D. Pfeiffer, Presiding Judge

Edward R. Ardini, Jr., and Thomas N. Chapman, Judges, concur.